H. Winston HULL et al., Appellants,

v.

Robert S. CALVERT, Comptroller of Public
Accounts of the State of Texas,
Appellee.

No. 11827.

Court of Civil Appeals of Texas,
Austin.

June 9, 1971.

Rehearing Denied July 21, 1971.

Stayton, Maloney, Black, Hearne & Babb, John W. Stayton, Austin, for appellants.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., J. C. Davis, Malcolm L. Quick and Melvin E. Corley, Asst. Attys. Gen., Austin, Shafer, Gilliland, Davis, Bunton & McCollum, Odessa, for appellee.

PHILLIPS, Chief Justice.

Suit was brought in the District Court by H. Winston Hull and others [1] against Robert S. Calvert, Comptroller of Public Accounts of Texas. Plaintiffs-Appellants are taxpayers who own real property in Ector County and who pay taxes to the State of Texas.

Appellants sought to enjoin Appellee Comptroller from disbursing funds for the planning and operation of the University of Texas at the Permian Basin upon a site purportedly acquired for such University by the Board of Regents of The University of Texas System. The authority for the acquisition of this site is provided for by H.B. 157, Acts 1969, 61st Leg., Reg. Session, Ch. 459, p. 1523, Vernon's Ann.Civ. St., Article 2606c–4.

Appellants alleged that in acquiring an interest in the site the Regents did not comply with the requirements of H.B. 157, and that in disbursing funds for the planning and operation of the University upon such site Appellee has, and is acting, without authority of law and in direct violation of the provisions of H.B. 157.

Both parties filed motions for summary judgment in the trial court and that of Appellee was granted and that of Appellants was refused by the trial court.

The judgment of the trial court is affirmed in part and reversed and rendered in part.

I.

The two tracts of land acquired by the Regents as a site for The University of Texas of the Permian Basin, hereinafter referred to as the University, are comprised of one tract containing approximately 308 acres and the other about 280 acres. The acreage is located in Section 18, Block 41, T–2–S, T & P RR. Co. Survey, Ector County. These two tracts will hereinafter be referred to as Section 18 except in instances in which it is necessary to differentiate between them.

Section 18 in its entirety lies within the confines of the Headlee Devonian Field. This field is unitized for oil and gas operation. There is a gas injection operation engaged in by the unit, through Getty as Unit operator, which is known in the industry as a gas cycling project. In this operation, gas is produced from the reservoir and the liquids contained therein (ethane, propane, butane and heavier hydro-carbons) are removed. The dry gas, together with an additional volume of dry gas acquired elsewhere, equal to the volume of the liquids removed from the produced gas, is injected back into the Devonian reservoir through compressor stations and injection wells. This process continues over and over; and this continuous circulation of the gas will continue until at some point of time in the future when all of the economically recoverable liquids will have been removed from the gas.

In addition to having the right, as owners of the mineral estate, to use the surface of Section 18 in oil and gas operations, the owners of the mineral estate

1. The remaining Appellants are Mrs. Ruth Burton, John B. Ashmun, D. A. Ross and Charles C. Green, Jr.

have acquired surface leases on portions of Section 18, such surface leases giving such owners the express right to use the leased surface in oil and gas operations. Six surface leases of 3.67 acres each have been granted around producing wells. In addition, two surface leases upon 4.59 acres each have been granted around each of two injection wells. The eight surface leases cover 31.2 acres and are scattered throughout Section 18.

Appellants' evidence was that unit operation of the Devonian reservoir will continue for from twenty to forty years. That additional use of the surface of Section 18 may be required for such operations. That a secondary recovery project for the Ellenberger formation is under study. That it may be necessary to make more use of the surface of Section 18 in these operations. That it may be advisable to drill additional wells and to install more facilities on Section 18.

## II.

Section 18 was conveyed to Ector County on October 2, 1969 by one McKnight and others. All parties to this lawsuit agree that the 308 acre tract is a gift to the University by way of Houston Endowment, Inc. The deed first grants an easement for a proposed county road. The deed next conveys the 308 acre tract "IN TRUST, for the use and benefit of the University of Texas, for the purpose of establishing and maintaining thereon a fully state supported co-educational institution of higher learning, to be known as the University of Texas of the Permian Basin (as provided by Chapter 459, Acts of the 61st Legislature, Regular Session 1969); provided, however, that the County * * *, as trustee, may convey the * * * property to the persons who compose the Board of Regents of the University of Texas, as Trustees, for the use and benefit of the University of Texas."

The deed then conveys to the County the 280 acre tract.

There is expressly excepted from the conveyance the oil, gas and mineral estate; and the deed expressly recited that it is made subject to the oil, gas and mineral leases theretofore executed by McKnight, et al., and to the unitization agreement and enlargements thereof for the Headlee Devonian unit.

The deed recites that "the Board of Regents of the University of Texas will be concerned about the program of development for oil, gas and other minerals in and under the property described * * * (the 308 acre tract). The grantors relinquish their right to develop for oil, gas or other minerals in and under the 308 acre tract and agree that all future development of the mineral estate in and under the 308 acre tract shall be conducted by utilizing the 280 acre tract. The grantors agree that all future well locations shall be located on the 280 acre tract; and expressly provide that wells may be directionally drilled therefrom so as to develop the minerals in and under the 308 acre tract.

The minutes of a special meeting of the Commissioners' Court held October 24, 1969, reflect the intention of the Commissioners to issue time warrants for the acquisition of the 280 acres for park purposes and for the acquisition of right-of-way for County road purposes. The order authorizing the giving of notice of such intention recites that the Regents are willing to accept Section 18 as a site for the University. It further recites that McKnight, et al., will convey the 308 acre tract to the County in trust for the University and that the 280 acre tract will "be conveyed to the County for its use as a County Park— without right of reverter."

After certain additional recitations not necessary to this opinion, the order recites the intention of the Commissioners' Court to issue time warrants in the maximum amount of $1,350,000.00, $600,000.00 of which is to be used to acquire the 280 acre tract for park purposes, and the remainder of which is to be used for the acquisition and rights-of-way for County roads.

The deed to the 308 acres from the Commissioners to the Regents is dated October 29, 1969 and was filed for record December 12, 1969. The deed of 280 acres is dated December 12, 1969 and filed of record the same day.

The minutes of a meeting of the Commissioners' Court held on November 10, 1969, reflect that at such meeting the issuance of the $1,350,000.00 of warrants was authorized.

On September 12, 1969, the Regents adopted a resolution selecting Section 18 as the site for the University. The resolution expressly provides that the selection and acceptance of the site is subject to certain conditions which, among others, provide that the land shall be acquired at no cost to the State of Texas; that the conveyance shall convey title to the surface only; all oil and gas pipelines, of every character, and above ground production facilities and easements used in connection with the exploration for, production and marketing of all oil, gas and other minerals, located within the 308 acre campus core area shall be removed and relocated at no cost or expense to the State of Texas.

At a meeting held December. 12, 1969, the Regents resolved to accept from Ector County the conveyances of the 308 acre tract and the 280 acre tract. The resolution contains the following proviso:

"provided, however, that other than acquisition of land for such institution, no action to activate and operate The University of Texas of the Permian Basin shall be taken by the Board of Regents unless and until each and all of the following conditions are satisfied and met:

a. The oil, gas and other minerals contained in and under the 308 acre campus core area shall be explored for, produced, and marketed only on lands adjoining the campus core area through the drilling, operation, and maintenance of directional wells located on said adjacent lands or by being pooled or unitized with adjacent lands.

b. All oil and gas pipelines, of every character, and above ground production facilities used in connection with the exploration for, production or marketing of all oil, gas and other minerals, located within the 308 acre campus core area shall be removed and relocated elsewhere at no cost or expense to the State of Texas.

c. The Commissioners' Court of Ector County and/or the City Council of Odessa shall have acquired the right of way for and constructed, at no cost or expense to the State of Texas, (1) a street known as 'Parkway Boulevard' along the West boundary of the above-described 600 acre tract of land connecting 27th and 42nd Streets, and (2) 27th Street along the South boundary of the above-described 600 acre tract to connect with Loop 338.

d. The City Council of Odessa shall annex the above-described 600 acre tract of land into the City of Odessa in order that all of the terms and provisions of Oil and Gas Ordinance No. 60–25, as amended, adopted by the City Council of Odessa, Texas, regulating oil and gas well drilling, oil and gas production, oil and gas pipeline transmission, pipeline installation, waterflooding and gas injection for oil recovery shall be applicable thereto."

The record reflects certain attempts made by Ector County and by the Regents to persuade the owners of the mineral estate to comply with the conditions imposed by the Regents in acquiring an interest in the surface of Section 18 for the University. These include correspondence between the Ector County Judge and the General Manager of Getty Oil Company wherein the former advised the latter of the conditions imposed by the Regents and the latter informed the former, on more than one occasion, of the engineering, economic and legal difficulties involved. Finally, in a letter dated October 23, 1969, Getty's Manager advised the Ector County Judge in detail as to why the owners of the mineral

estate could not comply with the conditions imposed by the Regents.

### III.

Appellees are before us on five points of error, the first two, briefed together, are that in accepting conveyances of some kind of interest in the surface of Section 18, such acceptance being conditioned upon the removal of the oil and gas facilities situated upon the 308 acre tract and upon the agreement of the owners of the mineral estate to forego future use of the surface of the 308 acre tract in oil and gas operations, the Regents did not acquire on or before December 31, 1969, the site for the University authorized and required by H.B. 157. Under the express provisions of H.B. 157, the action of the Regents was and is null and void; the trial court erred in holding to the contrary; and erred upon the basis of such holding, in refusing to grant Plaintiffs' (Appellants) motion for summary judgment that would prohibit Defendant (Appellee) from disbursing funds for the planning of the University on such site; that the court erred in granting Defendant's (Appellee) motion for summary judgment.

We overrule these points.

The pertinent provisions of H.B. 157 read as follows:

"Sec. 4.   The Board is hereby authorized and directed to establish the institution and locate same on a site selected by the Board as follows:

(a) The site shall consist of 200 acres or more, unless otherwise specifically acceptable to the Board, and must be accessible within a reasonable length of time to roads, required utilities to the perimeter of said site, and within a reasonable distance and accessible to the present site of the Odessa College campus in Odessa, Texas.

(b) The Board shall select a site which is in Ector County; provided however, the site may extend into an ad-joining county; and provided further, if within the discretion of the Board, those sites made available within the provisions of this Act are not suitable and other sites are suitable, then the Board is authorized to accept and acquire a similar site in whole or part in an adjoining county; provided said site is not more than a 12 mile radius from the present campus of Odessa College in Odessa, Texas.

(c) The Board is authorized to accept and acquire and shall accept and acquire such site for said college within the provisions of this Act and the land for same shall be deeded by proper conveyance free and clear of debt, to the State.

(d) The Board shall in no event delay the acquisition of land for said institution created herein within the provisions of this Act later than the 31st day of December, 1969.

(e) It is further provided that the Board must follow the provisions of this Act with respect to site and any decision reached to the contrary shall be null and void and all laws to the contrary are hereby expressly repealed."

The question presented here is whether or not the Regents met the requirement of subsection (d).   Appellants contend that the requirement was not met in that on December 31, 1969 they had no such interest in or title to Section 18 as would allow the establishment of the University.   They further contend that the purpose of the deadline fixed by the legislature is to insure that the establishment of the University is not delayed.   The Regents "shall in no event delay the acquisition of land for said institution * * * later than the 31st day of December, 1969" and "any decision reached to the contrary shall be null and void."

We cannot agree with Appellants' contention.   As stated above, it is agreed that the 308 acres has been donated to the University of Houston Endowment, Inc.

free of any debt. Thus paragraph (c) of Section 4 of Article 2606c–4 has been complied with. Paragraph (e) of the same Section and Article was also complied with in that the land was acquired by the 31st day of December, 1969.

Appellants argue that the acceptance of the site was conditioned upon the fact that the mineral owners shall have agreed to waive rights of ingress and egress to the surface for the purpose of exploring for, producing and marketing the oil, gas and other minerals. Another condition being that oil and gas pipelines, above ground production facilities and easements used in connection with and exploration for, production or marketing of all oil, gas and other minerals located on the 308 acres shall be removed and relocated at no cost or expense to the State of Texas. That by their own conditions imposed on the acceptance, a "site" was not acquired by the required date.

By their resolution of December 12, 1969, set out above, the Regents resolved to *accept* the conveyance of the 308 acre tract and the 280 acre tract. The resolution states "provided however that other than *acquisition* of land for such institution, no action *to activate and operate* the University of Texas * * * shall be taken * * * until * * * the following conditions are satisfied and met." Then follow the conditions summarized above.

Thus the Regents accepted the land and acquired it and fulfilled the requirements of the statute. The conditions imposed by action of the Board of Regents relate to the "activation and operation" of the University.

Any authority possessed by the Regents must be statutory. Article 2606c–4 empowering the Regents to establish a University of Texas of the Permian Basin authorizes the Regents to "accept from the federal government or any foundation, trust fund, corporation, or individual donations, gifts, and grants, including real estate, buildings etc." Article 2596 (passed in 1895) invests the Regents with the sole and exclusive management and control of the lands acquired by the University of Texas, with the right to sell, lease and otherwise manage, control and use them in any manner. Thus the legislature has given Regents broad discretion in managing the affairs of the University and, in addition, has allowed them access to certain types of funds, other than State funds, for use in establishing the University. This authority, coupled with the right of condemnation gives them a broad and powerful leeway in *activating* the site already *acquired*. Armed with these powers vested in them by the legislature, the present Regents and their successors in office are equipped to do what is necessary to prepare the site for the University. Inasmuch as the legislature has the authority to delegate the establishment of this University to the Regents and inasmuch as the Regents have complied, and are presently complying with this mandate, this Court has no authority to impose its judgment as to the prerequisites of the acquired site. The wisdom of this choice is not within the prerogative of this Court.

It must be borne in mind, however that our holding under points one and two applies only to the 308 acre gift to the University by way of Houston Endowment, Inc. The 280 acre tract acquired through purchase by the County Commissioners will be discussed under points three and four.

Appellants' third and fourth points of error, briefed together, are that in accepting conveyances of some kind of interest in the surface of Section 18, the Regents did not acquire the site prescribed by H.B. 157 because the 280 acre tract purportedly conveyed by the County to the Regents was not "deeded by proper conveyance free and clear of debt, to the State." Under the express provisions of H.B. 157, the action of the Regents was and is null and void; the trial court erred in holding to the contrary; and erred, upon the basis of such holding, in refusing to grant Plaintiffs' (Appellants) motion for summary judgment

that would prohibit Defendant (Appellee) from disbursing funds for the planning of the University on such site; the trial court further erred upon the basis of such holding, in granting Defendant's (Appellee) motion for summary judgment.

We sustain these points.

On September 12, 1969, the Regents adopted a resolution reciting that acquisition of approximately 600 acres of land in Ector County, Texas complies with the provision of House Bill No. 157. The Regents resolved that they are authorized to accept a donation of that certain tract of land upon which site the University will be located.

On October 24, 1969, the Commissioners' Court of Ector County adopted an order authorizing the giving of notice of intention to issue time warrants for the acquisition of land for park purposes and the acquisition of right-of-way for County road purposes. The order contains the following recitation:

"WHEREAS, the Board of Regents of The University of Texas System has indicated that a certain site in Ector County, Texas, has been selected and the Board has stated it would accept such tract upon certain terms and conditions *(as expressed in a resolution of the Board adopted September 12, 1969)* and the Chairman of the said Board of Regents is authorized to enter into an agreement to provide for conveyance of said tract as may be deemed in the best interest of the State of Texas * * *"

In the same order are the recitations about the 280 acre tract.

On November 10, 1969, the Commissioners' Court entered an order authorizing the issuance of $1,350,000 in time warrants. $600,000 of this amount is to be used to acquire the 280 acre tract for park purposes, the remainder of which is to be used for County roads.

The surface of the 280 acre tract was conveyed by McKnight, et al. to Ector County by deed dated October 2, 1969. This conveyance is not in trust, upon condition, or for any express purpose; the deed purports to be an outright grant of the surface. As stated above, the 280 acres was conveyed to the Regents on December 12, 1969.

Section 18, Article V of the Texas Constitution, provides that the Commissioners' Court "shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed."

Appellants contend that it is not the function of the Commissioners' Court of Ector County to provide a site for the University. That the court was not engaged in "County business" in this transaction. They further contend that the issuance of the time warrants to purchase a County park was a blatant subterfuge that the tract was purchased so that it could be donated to the University. That its order of October 24, 1969 authorizing the giving of notice of intention to issue time warrants expressly refers to the resolution of the Regents dated September 12, 1969.

Appellants further argue that since the 280 acre tract was purchased with funds the Commissioners' Court had no right to use for such purpose, and since the Regents participated in the transaction, the University holds whatever title it has to such tract burdened with an equitable lien in the amount of $600,000.00, the amount of the funds illegally diverted by the Commissioners' Court. That the University has not acquired the tract "by proper conveyance free and clear of debt."

Viewing this transaction from its four corners, there can be no reasonable conclusion other than that the Commissioners were attempting to purchase land for a State University. We hold that they have no authority to do so.

By reason of the aforementioned provision of the Constitution, the power of a Commissioners' Court to use County funds for very worthwhile public purposes has been denied upon the ground that such purposes did not constitute "County business." The annotations in 2 Vernon's Texas Constitution 273, 274 reflect that opinions of the Attorney General have denied the power of a Commissioners' Court to spend funds for the following purposes: to make donations to the Tuberculosis Association, to the American National Red Cross, or to any other charitable organization; to purchase a site for donation to the United States Government for the purposes of a military reservation; to decorate the Courthouse lawn during Christmas; to erect a building for National Youth Administration purposes; to create a museum in the Courthouse room used by the Daughters of the Confederacy; and to aid a vocational school for the benefit of ex-servicemen.

As early as August 1, 1969, the Regents were on record as requiring "not less than 600 acres of land joining Loop 338 and 42nd St." for the site for the University. On September 12, 1969, the Regents resolved "that the acquisition of approximately 600 acres of land in Ector County, Texas * * * complies with the provisions of House Bill No. 157." Upon no occasion did the Regents determine that initially only the 308 acre tract was required for the site; and that the County could acquire the 280 acre tract and use it as a park until some indefinite time in the future when it might be required as part of the site. The Commissioners' Court was under no misapprehension. Its order of October 24, 1969 authorizing the giving of notice of intention to issue time warrants expressly refers to the resolution of the Regents dated September 12, 1969, and quoted from it in the foregoing paragraph. The recital that the tract was suitable for park purposes and is being acquired for such purpose and will be utilized for such purpose, at the same time recognizing the power of the Regents to acquire the same for the University through eminent domain, can be explained in no other way.

■ We hold that inasmuch as the Commissioners are powerless to purchase land for the University, that the 280 acres conveyed to the Regents was impressed with an equitable lien for the value of the bond issue. Thus this purchase did not fulfill the requirements of H.B. 157, that it be donated to the University free from debt.

There is no doubt that the Commissioners can purchase the 280 acres for County purposes such as park or roadways and title in the County for such purposes is valid.

### III.

■ Appellants' fifth point of error, which we overrule, is that the University has not acquired the 308 acre tract by "proper conveyance" because its deed provides that such tract shall never be any part of the permanent University fund and shall not be subject to legislative control.

The 308 acre tract, by the terms of the deed, was a donation to the University by Ector County, and such donation provided that the land would never be a part of the permanent University fund.

Appellants erroneously allege that Article 2590, V.C.S., controls the subject situation, requiring that "all grants, donations and appropriations that may be made or received from any other source" constitute a permanent fund for the University. This Article, which has not been amended since 1925, was enacted pursuant to Article VII, Section 11 of the Texas Constitution as adopted in 1876. In 1930, Section 11 of Article VII was amended to read in its pertinent part as follows:

"In order to enable the Legislature to perform the duties set forth in the fore-

going Section, it is hereby declared all lands and other property heretofore set apart and appropriated for the establishment and maintenance of the University of Texas, together with all the proceeds of sales of the same, heretofore made or hereafter to be made, and all grants, donations and appropriations that may hereafter be made by the State of Texas, or from any other source, *except donations limited to specific purposes,* shall constitute and become a Permanent University Fund." (Emphasis added)

Further, the cases cited by Appellants in support of their argument, Conley v. Daughters of the Republic, 106 Tex. 80, 156 S.W. 197, 157 S.W. 937 (1913) and Splawn v. Woodard, 287 S.W. 677 (Tex. Civ.App.1926, no writ) were decided in 1913 and 1926 respectively, both prior to the 1930 amendment of Article VII, Section 11.

The 1930 amendment has made possible the use of many donations for specific use of the law school, medical school, and other branches of the University. The 1930 amendment has removed the teeth and jaw bone of Article 2590, as far as donations limited to specific purposes are concerned, and the 308 acre tract stands "acquired by proper conveyance" as a donation limited to a specific purpose.

We affirm the judgment of the trial court with respect to the 308 acre gift to the University; however, we reverse the judgment of the trial court and herein render judgment that the Comptroller be enjoined from expending State funds on the 280 acre tract.

Affirmed in part and reversed and rendered in part.

O'QUINN, Justice (dissenting).

The majority of this Court has held that the Commissioners' Court of Ector County was without authority to acquire land for The University of Texas and that acquisition of the 280 acres by the Board of Regents did not fulfill the requirements of House Bill 157 (Acts 1969, 61st Leg., ch. 459, p. 1523; Art. 2606c—4, Vernon's Anno.Rev.Civ.Sts.). With this decision I am in accord and concur in such holding.

The majority has also held that the tract of 308 acres, which was a gift to the University free of any debt, was acquired by the Board of Regents in compliance with paragraphs (c) and (e) of H.B. 157.

It is with respect to the latter holding that I am not in agreement and file this dissent in order to state my reasons.

In my opinion the Board of Regents did not accept and acquire the 308 acres within the provisions of H.B. 157 and the Regents' decision to accept the land on stipulated conditions is contrary to the Act and therefore null and void.

The legislature, in H.B. 157, "authorized and directed" the Board of Regents "to establish and maintain a fully state-supported coeducational institution of higher learning to be known as The University of Texas of the Permian Basin."

"The site for said institution," the legislature declared, "shall be chosen as provided for herein."

Section 4 of the Act stated that "The Board is hereby authorized and directed *to establish the institution* and *locate same on a site* selected by the Board" as provided in subparagraphs (a) through (e). Subparagraph (a) required that the site "must be accessible *within a reasonable length of time* to roads." Subparagraph (c) required that the Board "accept and acquire such site for said college within the provisions of this Act," and under subparagraph (d) the Regents "shall in no event delay the acquisition of land for said *institution created herein* within the provisions of this Act later than the 31st day of December, 1969." (Emphasis supplied).

The Board of Regents accepted title to the 308 acres on December 12, 1969, nearly three weeks prior to the expiration of the period for acquisition fixed by the legislature. But in accepting the land the Regents, by resolution, put certain qualifications on any action it might take "to activate and operate The University of Texas of the Permian Basin."

The Board plainly stated that "other than acquisition" it would go no further to "activate and operate" the institution *"unless and until each and all of the * * * conditions"* set out by the Board were *"satisfied and met."* (Emphasis supplied). The first two conditions, that all oil and gas exploration, production, and marketing must be conducted in the future entirely from adjoining lands and that existing pipelines and other facilities on the site must be removed and relocated elsewhere, have not been, and are not likely to be, "satisfied and met." Getty Oil Company understandably has refused to comply with a request to make possible removal of either of these two conditions.

If the Board had regarded the 308 acres suitable, in the state in which the land was acquired, "to establish the institution and locate same on a site", the conditions, without satisfaction of which the Board declared it would take "no action to activate and operate" the institution, would have been wholly unnecessary. The Board obviously did not regard the site as suitable, and the record does not disclose that the Board, after hearing from Getty, decided to "activate and operate" the institution even though the conditions had not been satisfied.

The record shows, as pointed out by the majority, that oil and gas operations on the 308 acres are likely to continue for twenty to forty years, or perhaps for an undetermined additional period if secondary recovery operations are undertaken.

H.B. 157 evidences some urgency intended by the legislature in establishing the institution. Access roads were to be provided within a reasonable time. The Board was directed to establish and locate on the site an institution created in the Act itself. There is nothing in the legislative mandate to suggest authorization of a long delay, either in acquisition of the land or in activating and operating the college. Certainly it was not contemplated under terms of the Act that activation and operation would be delayed twenty to forty years, or until conditions imposed by the Regents should be satisfied.

It is my view that H.B. 157 did not authorize the Board to accept a site it clearly regarded as not suitable for the operation of an institution of higher learning. The Regents could not in one breath accept the land as a site for the college and in the next breath reject the site as not a fit place on which to activate and operate a college, without thereby departing from the legislature's plain mandate to find a site and establish on it the very institution of higher learning created in the Act. I would hold that the Board's acceptance was not within provisions of the Act. In so holding, this Court would not substitute its judgment for that of the Regents. The Court would but perform the judicial function of declaring the Board's action in fatal conflict with provisions of the Act. The Board's decision to qualify its acceptance with conditions, which, if not satisfied, condemned the site as unsuitable, did not follow the Act, and acceptance of the 308 acres under such circumstances should be declared null and void. Art. 2606c—4, § 4, subp. (e).